v. AT&T Mobility Inc. v. Flo TV Inc. Mr. Hendricks, why don't we give the other side a chance to get settled? Okay, I think we're ready if you are. Thank you, Your Honor. May it please the Court, my name is John Hendricks and I represent Appellate EON Corporation in this matter. This appeal presents an important question in this Court's evolving jurisprudence concerning the algorithm requirement for computer implemented functional terms. Specifically, what is the requirement for, what is the role for a person of ordinary skill in the arts in applying the so-called general purpose computer or CATS exception to the algorithm requirement? The two key cases on the general purpose computer exception in CATS and ERGO have not expressly addressed this question. So, I mean, we all agree that CATS doesn't deal with the question of using, of what happens when you assert a person's skills in the art and his evaluation or her evaluation of what's going on, right? CATS didn't deal with that. I believe it didn't deal with it, although I believe it provides an implicit answer. Well, what, I mean, CATS, the terms at issue at CATS, which they allowed, was processing, receiving, and storing, and they said they weren't indefinite because general purpose computer didn't have to be specifically programmed. How does a person's skill, you're gleaning from that that there was an implication that we're talking about a person's skills in the art and how they would read the references? No, Your Honor, I would agree with you that there was nothing specifically stated in CATS to address that issue. My point really goes to the fact that the CATS court assumed something quite different from the algorithm cases. The CATS court was looking at the issue of whether a microprocessor alone or under what circumstances a microprocessor alone could ever be sufficient structure to comply with section 112 paragraph six. Historically, that question would be put, the question of sufficiency of structure would be put to a person of ordinary skill in the art. That has been established in this court's jurisprudence in other cases, including aristocrat. Well, that had to deal with when you have an algorithm and you want to know whether or not it's specific enough. Correct. We don't have that situation, do we? Exactly. But one of the presumptions of that algorithm requirement is that the microcomputer alone constitutes no structure. And CATS, and that the algorithm, therefore, is some structure. So subsequently, in cases like NOAA v. Intuit, the court found, well, we don't need to look at a person of ordinary skill in the art for cases in which there has been no algorithm or no structure disclosed. And therefore, it was not error for the court to exclude expert testimony on that issue. So I guess my only point about… I'm not sure I understand. When you say the prior cases treated the recitation of a computer as no structure, the computer is structure. Agreed. And I understood those cases to say that there simply wasn't anything more than a mere assertion of a general purpose computer, which is not sufficient structure, to be the structure necessary under 112-6 or 112-F to satisfy the specification contained structural requirement. Correct. And I think that's a reasonable reading of those cases. But my point goes, for example, especially with NOAA, which came after CATS, because NOAA… In NOAA, the court was asked to consider whether the district court erred in excluding the testimony of an expert of what a person of ordinary skill in the art would think of the reference to a microprocessor without structure. And the NOAA court basically said, well, because the algorithm requirement assumes that a microprocessor is really no structure, we don't put that question to the expert. We only put the question in 112-6 to the expert when some structure has been disclosed, and the question is sufficiency of that structure. I believe that CATS was operating outside of that by creating an exception, because in CATS, the whole issue really was under what circumstances a microprocessor is sufficient. And, of course, the CATS court answered that it's sufficient if a computer could accomplish these programs without special programming, if a general-purpose computer. So I perhaps overstated my case in response to your question regarding whether or not the cases have really directly addressed the issue of role of a person of ordinary skill. They don't. Neither CATS nor ERGO does. But it's important to recognize that one of the reasons that there is information, there is jurisprudence in this court that talks about the role of a person of ordinary skill in the art in assessing structure. And so our argument here today is that the position adopted by the district court would, in fact, short-circuit that inquiry by creating a bright-line test for when a microprocessor is sufficient. And that by doing so… Does NOAA say quite explicitly that while it is true that the sufficiency of the disclosure of an algorithmic structure must be judged in light of ordinary skill in the art, yada-da, in a situation in which the specification discloses no algorithm, this principle has no application? It does, and that's the exact point I was trying to make. The reason it states that is because it has no application because it treats the algorithm as the only structure. Microprocessor, by legal fiction, is no structure. And there are several statements to that effect in the case itself. But, of course, NOAA actually has a footnote in it stating, of course, we're not looking at this issue from the perspective of a CATS exception. We're looking at this question from the perspective… In NOAA, if you recall, the case was that there were functional terms and there was one algorithm, but the court found that the functional terms included two functions. And the question arose, what should we do if only one algorithm for one function is disclosed? Should we treat it as insufficient structure because it doesn't have a second algorithm, or should we treat it as no structure? And what hangs in… The principle would have to be applicable for you to prevail in this case. I guess I'm not quite clear on where you would take the law. I mean, you agree that CATS is on point, right? Correct, Your Honor. I guess, can you articulate what your principle is and then give us what cases you're deriving that from? Yes, Your Honor. Stated affirmatively, EON's position is that under CATS, the disclosure of a microprocessor is sufficient structure to meet the requirements of Section 112, Paragraph 6. If a person of ordinary skill in the art would understand the performance of that function to require no more than routine programming utilizing a general purpose computer. That is our affirmative position. I'll state it again. If a person of ordinary skill in the art would understand the performance of that function to require no more than routine programming utilizing a general purpose computer. Is that different from saying that a person of ordinary skill would be able to program the computer to achieve that function? It is indeed. And the appellees have argued that our case, that the argument is the enablement argument that you have just summarized, which is they argue that we're making the case that the role of the ordinary person of skill is whether or not, that person could write a program to accomplish the function. That is not the position we're espousing here. We're espousing the position of whether a person of ordinary skill in the art would know that at the time there were routine ways of doing this. When you say routine ways, you're not defining routine as off the shelf as the district court did. Obviously, yes. You're defining routine as something that a person of ordinary skill could do. Not necessarily that it could do. I think the distinction between special programming and routine programming that we're acknowledging is a part of our recommendation, is that a person of ordinary skill in the art, as reflected through expert testimony, could make use of the same types of extrinsic evidence that experts make use of all the time. For example, learned treatises. Let me go back, because I'm having a hard time seeing where you're drawing the line. Are you saying that the 112.6 question is whether a person of ordinary skill in the art could program this without breaking a sweat, as opposed to the person could program this, period? No, Your Honor, not exactly. If we're talking about programming that is not off the shelf programming, we're talking about something that that person would have to say, I assume. Somebody's going to have to program this to accomplish this function. Now, what's the nature of the distinction between the test that person would employ to say whether this is routine programming versus this is something that this person could do for purposes, let's say, of enablement? The distinction between routine programming and what we're calling special programming would be based on what a person of ordinary skill could look at in the extrinsic evidence. For example, learned treatises. And the case below illustrates this in a pretty clear fashion. In the case below, Dr. Sauer, Eon's expert, referred to two learned, I would call them learned treatises. They were actually desk manuals that were virtually ubiquitous at the time in 1991. And in one of these desk manuals, Petzold, named for Charles Petzold, it was a desk manual for programmers that basically outlined, like a desk reference for a physician, outlined ways, algorithms, ways of doing certain types of tasks on the computer. And in that learned treatise, Dr. Sauer pointed out that the terms at issue in our case, many of which concern doing things with menus, displaying menus, creating submenus, that these things were actually described in Petzold as routine tasks that would take, you know, take the following three approaches. And those approaches are set forward. Three lines of script in Petzold shows how one can actually create a menu for television programming, utilizing the general purpose computer. So to bring it back, the standard, we're not, I don't think it's quite as ambiguous as, well, could he do it versus could he do it without breaking a sweat. The standard is whether he would know that at the time of the invention, it was a well-established and easily performed function. There was agreement by the experts, was there not, that the claim function could be implemented in multiple different ways, right? Yes, Your Honor. Doesn't that matter? Doesn't that make a difference when we're talking about the notice function? Well, I don't believe it does. And for this reason, I don't think even the algorithm requirement goes so far as to require that the structure disclosed has to be sufficient to eliminate all but one way of implementing the invention. In fact, there are cases that I remind you of. All but one way is a little, there's daylight between all but one way and multiple different ways. Well, and there's some daylight between multiple different ways and three well-established ways. So our argument would be if there are, if there is a well-established way, a lot of the differences that we're looking at when we talk about programming, there was testimony on this too, is simply differences in the style in which a programmer uses to perform a basic program. But the elements of the code are all there. So, for example, in one of the cases in the district court, Nevada decided after Ergo and Katz, the party said, the plaintiff said, look, this could be accomplished by a general purpose computer without special programming. This meaning a means of calculating the distance between two points on a touchpad. And he described what it would take would be a programmer actually programming the Pythagorean theorem or the means for using that theorem to calculate distance into the computer. Now, clearly that required, you know, some programming. But the court found in that case that that task was not so, was not special because it was basic programming that every programmer at the time knew how to do and would know how to do. But I might point out that the Pythagorean theorem could be programmed in the computer in various different ways. So the argument that appellees make that, hey, well, you've admitted that something could be programmed in multiple ways. Well, yes, stylistically, we have. And Pythagorean theorem could look at a squared plus b squared equals c squared or could start with one of the other numbers in the sequence. But that doesn't mean that it's not a basic program that's not well established and easy to do. You're into your rebuttal. Thank you. I'll hear from the other side, which I understand is a split argument. So, Mr. Fran first and then Ms. Singhali. OK. We're going to run the clock for you individually. Thank you, Your Honor. And may it please the court, fuzz Fran of Simpson, Thatcher and Bartlett on behalf of Falcom and Flow in the 1393 case and arguing on behalf of all appellees. As you noted, Ms. Singhali may address some AT&T specific or other issues at the end. This case is about the question of whether or not Eon's eight claimed computerized functions are coextensive with the general purpose processor that it disclosed. They are not coextensive with that processor. Each one of these complex functions, which Eon described as achieving what it called in 1991, the marriage of the personal computer with the television. Each one of these functions requires additional specific programming to be added to the microprocessor. They disclosed what's more. Each one of the functions requires that that additional programming be written from scratch. The argument that Eon is advocating the test that they are proposing to this court would allow Eon or any patentee simply to claim with the disclosure of a general purpose processor. All means of accomplishing a function by writing a program without disclosing any algorithm whatsoever. That subverts 112.6. It undermines the very innovation that the patent system is supposed to foster, and it contradicts a long line of cases out of this court. Now, one of the elements of that patent system— If it's routine programming and a novel function, I hear you saying that it can never suffice to describe the function? If you—well, I think it comes back to the statute, and it comes back to the test set forth in Katz, which is we measure whether 112.6 has been met in the context of a microprocessor by looking at whether the structure that's disclosed can perform the function. And we know that actually from the remand order in the Katz case, which, interestingly, everyone reads Katz to assume that it found once and for all that the functions of processing, storing, and receiving data could be implemented on any general purpose microprocessor. That's not actually the holding. The holding is much more narrow and remands that very question to the district court to determine whether the processor that was disclosed in that case was by itself capable of performing the functions or whether there might be a narrower construction of the functions, which would require specific programming to be met. Now, if you applied that remand order in this case, Eon would lose. There is no dispute that the functions are not coextensive with a microprocessor, and I think that makes sense because each of these eight terms is actually a very complex function related to the configuration and operation of an interactive TV system. How would you define the role of the person of ordinary skill in the art in the 112.6 inquiry that we're involved in? I think what Judge Andrews did in this case illustrates it well, and there's one caveat that I would add to that. It illustrates it well because he asked both of the experts. Let me just start up. You don't agree with Judge Andrews' analysis, ultimately. Well, I certainly agree with the outcome. Let me put it. You don't embrace his analysis. I anticipated that might come up, and I believe that what Judge Andrews did was to really bend over backwards to look at the law in a light very favorable to the patent case. Okay, but where does the – articulate for me, if you will, as precisely as you can, the role of the person of ordinary skill in the art in the 112.6 inquiry vis-à-vis structural sufficiency? Right. So in the context of a computer-implemented function, the role of the person of ordinary skill in the art is as a threshold to determine whether an algorithm has been disclosed or not. In this case, there was no dispute about that. Let's talk about whether structure has been disclosed rather than the algorithm, because the algorithm only becomes pertinent because it's been deemed to be a form of structure. So then the role – and it was the same role that they performed in this case when Judge Andrews asked them, is the structure that is disclosed – in our case, a microprocessor – is that structure capable of performing the function, or do you have to add something else to it to do it? So that is part of the role of a person of ordinary skill in the art. And in this case, that question was answered, no, the microprocessor that Eon disclosed was not capable of doing it. Someone – and this is from the words of Dr. Sauer, Eon's expert – someone would have to write a program to do each one of these individual functions. And actually, Dr. Sauer undertook to write a program to do it, not once but twice, once for his deposition and then the second time in the lead-up to the evidentiary hearing that the court held. And neither time did either of his programs perform the function – and this is just as to one claim term – but neither time did they actually perform the function that was listed in Eon's claim term. So given your assessment of where the law is on this, how would you resolve the Nevada case, Elon? Well, there's two ways to look at that. I think the right way to look at it is it was wrongly decided because it failed to faithfully apply the Katz test, which is whether or not that function was coextensive with the processor that was disclosed. Now, interesting in Elon, there is a term before the section that – I meant Elon, not Eon. Right, okay. So in the section that Eon relies upon in that case, that's where your question is coming from. In the section right before that in Elon, the district court in Nevada actually invalidated as indefinite a term that it found required specific programming to be added. And I think no matter where you draw the line as to whether you draw it where Eon did or whether you draw it, I think, where Katz says, which is, is the disclosed structure coextensive with the function, this case is well beyond that line. I mean, Judge Andrews found, specifically found, that special code would have to be written for each one of these terms. He found specifically that special programming would have to be implemented for each one of these complex functions. And that's after specifically asking each expert about the complexity versus the triviality of the coding required to do it. Would it have been sufficient if the specification had referenced Petzold? That is an interesting question that I believe puts us in the range of the Atmel case that my friends have cited. Now, of course, that was not an algorithm case, but it did mention the name of an article. You know, that would be in tension, I believe, with the NOAA case as well as Aristocrat. NOAA, there was a reference to off-the-shelf software in the patent specification, which was not good enough in that case to combine. It was not sufficient disclosure of structure. And obviously, in Aristocrat, there was a reference to appropriate programming within the specification. The patentee tried to rely upon that plus one of ordinary skill in that. My recollection may fail me here, but I believe it was just a generic reference to appropriate programming. I believe that's right. As opposed to a book that contained the specific programs. I think that's a closer call, although both even taking Petzold and then adding it to what Eon's expert, Dr. Sauer, did, was writing two different types of programs, again, only for one of the functions and not implementing that function, plus the testimony of Dr. Grimes, the defense expert. There were multiple ways to do it. It wasn't even just the three that were set forth in Petzold. And that's actually one of the findings from Judge Andrews, is that there were multiple ways to program each of these functions. Presumably, if Petzold had been cited, then that would be deemed to be the corresponding structure, and therefore they'd be limited to Petzold and its equivalents. That might be a fair assumption. Eon's position here is that because it's admitted that these functions are not coextensive with the processes they disclosed, is that they need to clarify the standard that the court announced in Katz. And that's from the first page of the grade brief. They want to clarify Katz. And they want to clarify it, I think, in two ways.  And one is to create this distinction between special programming and some programming, between special programming and routine programming. And I would suggest to the court that there's absolutely no support in Katz for that proposition. The context in which special programming was used in Katz is in the same context that this court has long talked about special-purpose computers, going back to WMS Gaming in 1999, several earlier cases on which it relied, and continued forward through 2008 in Aristocrat and Blackboard, where when you take a general-purpose computer and program it to perform a specific function, you have then created a special-purpose machine. That's the context of what special programming means, and it's exactly the context that we have here. So the other way that Eon seeks to clarify Katz is to say that, you know, once there has been some disclosure of structure in a microprocessor, you can then look to the skill of one of ordinary, to one of ordinary skill in the art, to be able to write the program to accomplish the function. That's not a new proposition. That proposition was advanced in Aristocrat. It was advanced in Blackboard. It was advanced in NOAA. Many other cases have also addressed it, and it's been uniformly rejected. Aristocrat's actually a very good case in terms of looking at correspondence between the language. In Aristocrat, as we were just discussing, the court said that a generic reference to appropriate programming was not enough to give one of ordinary skill in the art the structure that they needed. In this case, in particular, in Eon's specification, they claim that it is, in its language, strikingly similar to Aristocrat, that software exercises appropriate control over the microprocessor. This was in column 5, lines 34 to 40 on page A9 in the record. That's almost squarely on point with what the court had rejected in Aristocrat, and it makes sense why we don't allow a person of ordinary skill in the art to fill the gap. Should you do that, you really reintroduce truly functional claiming in violation of paragraph 112, section 112, paragraph 6, and you leave the public, particularly in a case like this, where it's agreed that there's multiple ways to accomplish the function, and you leave the public in the position of guessing which ways are covered by the patent. And it's not merely that theoretical risk. Let me give you a real-world example drawn from this case. Mr. Morales, the inventor, testified that when he was trying to implement the functions of his interactive TV system, trying to accomplish the marriage of the TV and the PC, he had hundreds of engineers writing software. Where would you draw the line? How are we to know? How is the inventing public to know when, in fact, a person of skill in this skill, programming skill, constantly increasing, and where, in fact, and let's assume that the functions and the sequence of functions meets at least the fundamental test of novelty? Would you include the code in the specification? That's been done? It has been done. I certainly wouldn't advocate a test that requires that. I first think Eon's test is unworkable. It does not present any clear line to be drawn. In terms of disclosure, I think the disclosure of an algorithm, it's not a terribly high standard, as the court said in Fennett's argument, in any understandable means, whether a mathematical formula, prose, a flow chart. Certainly the example of submitting code is another way that patentees have done it. And as the court said in Typhoon Touch, it doesn't have to be an unending disclosure of what everyone knows, but there needs to be some structure. When you take on 112.6, when you choose to use the tool that the patent statute gives you of claiming a means plus function, you take on the obligation to describe the structure that actually performs the function. And Eon, it would be a different case here had Eon began to go down the line of setting forth an algorithm, began to go down the line of saying, here's one way to do it, or had they cited pencil, this would be a different case. But they didn't. All they said was software that appropriately controls. So you would agree with the district court that if you can buy a chip that performs the function that satisfies it? I think that would be consistent with the Katz test. You mean, but you're not saying that just if there's a chip out there on the market, you're saying that if you actually disclose the chip, right? If you identify the chip. I'm sorry if I misunderstood your question, Judge Newman. I was stating the broader circumstance. If you can just go out and say this is what I want to do to your friendly panel. I think that the district court's use of the off-the-shelf standard, be it for a microprocessor in the context that you're asking about or be it for a software program, which was his inquiry, I think that takes Katz beyond where Katz would draw the line. Just to take a specific – well, I'm sorry. I didn't mean to cut you off. I was just going to say, and I think the court specifically addressed that question in NOAA, where it found that a reference to, quote-unquote, off-the-shelf software was not good enough. So I think that that's – the decision in NOAA, I think the district court's approach with regard to off-the-shelf is in tension with what the court said before. To take a specific example, I mean, suppose that you had means-forward processing as not the ultimate invention, of course, but just one of the limitations in a set of limitations leading to some improvement on a program designed to facilitate creation of documents. Do you think that means-forward processing in which what you have is a computer and you don't have a reference to WordPerfect or Word in your specification, do you think that would be invalid? I think that you certainly could – yes, because you could look at NOAA, which went even beyond that to reference off-the-shelf software, which presumably off-the-shelf software would include word processing programs or any other. And it's really – I understand the court's concern about where to draw the practical line, but you have to remember the foundation of the statute and the requirement and the obligation that you undertake as a patentee when you choose to use functional claims. And language such as – further language such as means-forward processing in the structure was a computer programmed with commonly available word processing programs? That takes you a lot closer. I still think that's intention with NOAA. It's clearly not this case because these functions were a lot more complex than any of the – as found by the fact that the district court specifically asked, could you buy off-the-shelf software to perform any of these functions? There's no debate that you couldn't, and that's why Mr. Morales, the inventor, had hundreds of engineers working to try to develop these programs, none of which was disclosed in the patent. Not a shred of the ways in which they came up with to address these problems was disclosed in the patent. And I think that that really violates 112.6, and a patentee shouldn't get more claim coverage by giving less disclosure. Why don't we hear from your colleague? May it please the court. Diana Singalley on behalf of AT&T Mobility. I'm just going to briefly address AT&T's views on the issues that are before the court today, and I will start off by saying that our views are consistent with and aligned with the arguments that Mr. Frahn has presented today. There were a couple of questions that arose from Judge Bryson about the Petzold reference and whether disclosure of the Petzold reference would have been sufficient. I think in the Atmel case, it wasn't a reference to the paper itself, but actually that the title of the paper was in and of itself  So in that case, it wasn't simply incorporating by reference structure that was disclosed as another reference, but the disclosure of it itself satisfied the disclosure requirement of 112.6. So you think that an article, if it's the same article, and one of them has a title which hints at what the structure is that's revealed in the article, and the other has a title that's less clear, but the articles are identical, that the first would satisfy and the second would not? I think that in that case that you're not necessarily satisfying the disclosure requirements of 1.6. I mean, what in the article is it that you're referring to? You have to identify sufficient disclosure according to 112.6 in order to meet the statutory requirements, and simply a general reference may not meet that requirement. With the word processing program, again, that moves a little bit closer, but again, it depends on what the function is that you're looking at. If this is the function that can be performed by the word processing program, then perhaps in that type of circumstance, disclosure of a conventional word processing program may satisfy that structure in addition to the microprocessor, but it certainly isn't the microprocessor itself. And that's what's different about this case. There's nothing. Everybody has agreed in this particular case that there has been no disclosure of an algorithm of any sort in the patent. Instead, the only disclosure has been of a microprocessor. What Eon is trying to do is to extend the cat's exception to say that if the programming that will be required to perform that specific function would just be routine programming, then all you have to do is disclose a microprocessor. But the problem with that, we can see the problem with that in this case here. There are multiple ways. Everybody has admitted that none of the functions that are at issue here can be performed by a general purpose processor. Everybody has agreed additional programming is required. Everybody has agreed that there's multiple different ways of doing that, and that's what the problem is. If there's no disclosure in the specification of at least one of those ways or a class of those ways of performing that function, then there's really no bounds that are put on the scope of the claim. You don't know what the claim under 112.6 covers. Does it cover these routine ways? Does it cover less routine ways? You don't know. And that's why there needs to be some sort of disclosure in the specification of a method for implementing the functions that have been recited. The other reason that Eon's arguments are problematic in this case is that the functions in this case are not routine functions. The district court made these findings. There was an evidentiary hearing. There was expert testimony. The district court found that each of these functions was more complex than the functions that were at issue in CAS. The district court found that there would be additional programming that would be required. All of the experts agreed on that. So what do you think they should have included? What should have been included in the specification? Yes. There needed to be some sort of disclosure of a method for performing these functions. I don't know exactly what that was. We have learned through the evidence that has been put on there were multiple different ways of doing that. None of those ways were disclosed. There had to be something more than just simply saying that there was a processor that could be programmed by appropriate software or some sort of software. That's the problem. They say that these are straightforward methods. It seems that at least some of the steps fit that definition. Perhaps they all do. It looks to me as if this patent is written just like all of the others that we see. How do we know, how do you know, when more should be included and not? Are we going to have a 1,000-page specification in order to avoid exactly the situation that's arisen here? I'm not advocating a 1,000-page specification in order to satisfy the requirements. Again, this all hinges on what are the functions that are recited in the 112.6 language that the patentee chose to use. I'm asking for specificity. Pick any one of their functions and tell us what they should have done. Well, there's expert testimony on some of these functions. One of them was introducing new menus, and their expert testified that there had to be additional programming that needed to be done in order to introduce new menus. There was nothing in the specification that described how those new menus were introduced or how they could be formulated. It was just, in essence, in this case, all the specification disclosed was reiterating the function itself and saying that a computer could be programmed to do it. So what else should it have disclosed? I don't know what else it should have disclosed, and that's the problem. A general purpose processor on its own, as everybody has agreed, couldn't do that without some additional programming, but we don't know what that additional programming was because nobody told us what it was. It said perhaps it was disclosed in the... Apparently it's programming that your client is doing. That's why we're here. I would beg to differ that it is programming that our client is doing. And even if it... Again, that's part of the problem that we have here. Because there has been no programming that has been disclosed at all in the specification, we don't know what falls within the scope of the claim. We don't know what the bounds are on these 112.6 limitations. But we do know the function is being performed. We do know the function is being performed. Do you know that any programmer, smart programmer, can perform it? A smart programmer could perform programming to perform a function. But the computer... I'm not able to say that's fine. But the cases also say that when a general purpose processor can be programmed in many different ways to perform a function, there needs to be disclosure of... It becomes a function that's really not inherent with the function of the processor itself. There needs to be disclosure of some sort of other structure in addition to the microprocessor to put the public on notice of what the scope of these claims are. If these are routine functions, the disclosure may have been simple. In this case, there was no disclosure at all, and EON admits that there was no disclosure at all. They say that the only thing that was disclosed was a microprocessor. Okay. We have your argument. We've exceeded some of your time limit. So in order to try to keep this open, we'll restore three minutes... We'll give you an additional three minutes in addition to your four and a half, if you need it. Thank you, Ronna. Let me first address a couple of statements made by Kelly's counsel. First of all, the facts that were described are largely irrelevant to the district court's finding in this case. District court did not make findings of fact regarding the complexity of the functions at issue. That issue is still in debate between the parties. The reason the court didn't make a finding of fact about that is because both parties agreed that at least some, in our case, our argument is minimal routine programming, as known at the time, would be required. But there has been no finding of fact by the district court regarding the complexity, per se, of the functions issue. Secondly, the fact that the company who developed these patents employed hundreds of technologists or technicians has not been tied to any of the terms at issue before us now. And that leads me to the important point. We are not talking about computer programs for guided missile systems. We are talking about computer programs for introducing and modifying a menu. And the relevance of that is that as we read CATS, the person of ordinary skill in the art has a role in assessing whether those functions are sufficiently basic that they can be accomplished by a general purpose computer in routine programming. Do you think that that doctrine, as you've expressed it, survives the Ergo case? Is it consistent with the Ergo case? I think it can be. You raise an interesting question. And I really want to get back to your Petzold question in a minute. Take the Petzold first and then come back to it. Okay. With respect to, for example, your Honor asked, would it have made a difference if Petzold, the book title, or some piece of the book had been disclosed? And my answer to that question is no. It would not have made a difference to a person of ordinary skill in the art because a person of ordinary skill in the art would know that that was a routine program that anybody working during the time period could accomplish and would have in Petzold. So part of the role of a person of ordinary skill in the art is not merely assuming there's got to be structure before the person of ordinary skill in the art kicks in. Part of the role of a person of ordinary skill in the art is to assess how much structure is required. And I would submit that the disclosure of Petzold or the disclosure of what's in Petzold would have added absolutely nothing to a determination of the boundaries of this invention. So how does one determine which function of a long list is basic and which is not? And I think that one is the question as well for a person of ordinary skill. What we actually did in the case below is come up, both sides came up with a list of the functions and then a list of their paraphrase of the core functions. And so we agreed on the paraphrase of the core functions. For example, one of the core functions we agreed to was, quote, establishing a first menu directed to differently interactively selectable program theme subsets. But, you know, they argued that that function would entail more, doing more with the computer. We argued that function would entail doing less with the computer. But the fact of the matter is that the court never reached that issue because we conceded that the use of Petzold might be required there or the use of whatever is routine programming might be required there. And so the inquiry ended in the district court level because the inquiry, going back to your question about Ergo, ended when the court adopted a bright line test purportedly based on Ergo that an off the shelf, that a term is indefinite. If it cannot be performed by an off the shelf computer without, and off the shelf program, off the shelf software. So that is a bright line test that I think really does short circuit the role that this court and the U.S. Supreme Court in Nautilus has given to the person of ordinary skill in the art. Because again, and this is another way of stating it, the district court's standard, off the shelf standard, for applying the CATS exception, not only preempts the role of a person of ordinary skill in the art and understanding the scope of the claims, it is not consistent with section 112.6. Section 112.6 is frequently said to be there for, to prevent pure functional claiming. Well, that's true, but it's not specific. What 112.6 is there to do is to assure that the inventor is not getting more from the invention than his contribution to, or her contribution to the progress of the technology. So 112.6 says, we monitor overbroad claiming in functional terms by requiring that there be a structural referent that could carry out the function described. In our case, the algorithm cases came along and said in computer implemented terms, that is a per se not, it's not possible merely to look at a microprocessor per se required is an algorithm. CATS came along and said, there are some cases in which sufficient, in which a microprocessor is sufficient structure. Namely in those cases where the functions, and again, part of what's important here is to recognize that there are different types of functions. Certainly a person of ordinary skill in the art could describe a function as basic or not basic. It seems to me by looking at what was going on at the time, but, but basically CATS says you have to look at the function and you have to decide whether a person of ordinary skill in the art would understand how to perform that function or more. Let me, let me, let me, I misspoke. It's not the question of whether he would know how to perform that function. It's the question of whether that function would be routine to the point of being implicit. And for that, the purpose of ordinary skill in the art through what is done every day in district courts would have to look to experts and have to evaluate the credibility of their testimony. And also look at the foundation or the extrinsic evidence that they rely on. Ergo seems to suggest a different standard. I don't think it actually establishes such a standard. I think in ergo, the court does make statements that the CATS exception should be narrow and only applied in rare circumstances. But the language that everybody's using, that these functions couldn't, these functions are indefinite because it's clear that they couldn't be accomplished by merely plugging in the computer. I do read that as dicta that is explaining in an offhanded and casual way what the court was doing. I am certain that the court didn't intend that as a precise test for the application of CATS because the wording there leaves way too much hope. Just plugging in the computer, you can't do anything. So that kind of sloppy language could not have been, in my opinion, intended to set forth a hard and fast standard. And finally, Your Honor, I'm not aware of any district court cases, they have cited none until this district court case that has actually read the standard the way that the district court read the standard in ergo. In other words, if ergo had set forth a bright line test that off the shelf computers were the standard, I think we would have heard about it. But we, in fact, have not. In fact, some of the district court cases have implicitly rejected that standard. Thank you.